(C. D. 624)

FIBRE MAKING PROCESSES, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided April 29, 1942)

*G. W. R. Wallace; Barnes, Richardson & Colburn (Joseph Schwartz and George R. Tuttle* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*James F. Donnelly, Richard H. Welsh,* and *Joseph A. Howard, Jr.,* special attorneys), for the defendant.

Before TILSON, KINCHELOE, and DALLINGER, Judges

DALLINGER, Judge: This is a suit against the United States, arising at the port of Portland, Oreg., brought to recover certain customs duties alleged to have been improperly exacted on a particular importation invoiced as "Four 4/14" Sandberg Paper Pulps Diffuser Valves, Complete with Lifting Arrangement." Duty was levied thereon at the rate of 45 per centum ad valorem under paragraph 397 of the Tariff Act of 1930 as manufactures of metal not specially provided for. It is claimed that said articles are properly dutiable at but 20 per centum ad valorem under the provision for "machines for making paper pulp or paper, not specially provided for, and parts thereof, not specially provided for, wholly or in chief value of metal or porcelain," incorporated in paragraph 372 of the Tariff Act of 1930 by virtue of the trade agreement between the United States and Sweden promulgated in T. D. 47785, 68 Treas. Dec. 19.

It is alternatively claimed that said articles are properly dutiable at the rate of 27½ per centum ad valorem under the following provision incorporated in paragraph 353 of said act by virtue of the trade agreement between the United States and the United Kingdom, promulgated in T. D. 49753, 74 Treas. Dec. 253:

Machines having as an essential feature an electrical element or device and which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which

could be designed to operate without such electrical element or device (except articles of a class or kind with respect to which United States import duties have been reduced or bound against increase pursuant to any agreement heretofore concluded under section 350 of such act, as amended); all the foregoing, not specially provided for, finished or unfinished, wholly or in chief value of metal, and not provided for heretofore in any item numbered 353 in this schedule.

A further claim is made that the imported articles are properly dutiable at the rate of 25 per centum ad valorem under the following provision in said paragraph 353 incorporated therein by virtue of said British Trade Agreement:

Electrical signaling, radio, welding, and ignition apparatus, instruments (other than laboratory), and devices, electrical generators, transformers, converters, double current and motor generators, dynamotors, and all other articles suitable for producing, rectifying, modifying, controlling, or distributing electrical energy, and articles having as an essential feature an electrical element or device, such as electric motors, locomotives, portable tools, furnaces, heaters, ovens, refrigerators, and signs (except telephone, wiring, diagnostic, and therapeutic apparatus, instruments, and devices, primary cells, flashlights, switches, switch gear, fans, blowers, washing machines, and machines not herein provided for by name which would be dutiable under paragraph 372, Tariff Act of 1930, if of a kind which could be designed to operate without such electrical element or device, and except articles of a class or kind with respect to which United States import duties have been reduced or bound against increase pursuant to any agreement heretofore concluded under section 350 of such act, as amended); all the foregoing, not specially provided for, finished or unfinished, wholly or in chief value of metal, and not provided for heretofore in any item numbered 353 in this schedule.

The plaintiff offered in evidence the testimony of a single witness, Blaise Anthony Guttler, sales engineer, draftsman, and secretary of the plaintiff-corporation, who testified that in his capacity as salesman he had supervised the installation of machinery in pulp mills; that in the course of his duties he had visited every pulp mill in the United States; that he had seen valves identical with those invoiced herein at the Chesapeake Camp Corporation of Franklin, Va.; that said valves have only one use, namely, to be employed in conjunction with the pulp-making process; that said valves are shown on a blueprint of an entire system, which blueprint was admitted in evidence as illustrative exhibit A. The plaintiff then proceeded to testify in part as follows:

Q. Will you please start at the beginning of the process, from the raw material, and tell us how the paper pulp is produced.—A. There are various forms of pulp. We have the Kraft caustic system, the sulphite process and the groundwood newsprint. This process we are interested in is in connection with the caustic. Our wood comes in log form, about four feet in length. The logs are chipped and ground and then conveyed to the chip bin. This drawing starts with your chip bin. The chips are conveyed into the digester, and in the digester the stock is cooked under pressure. The pressure varies from 90 to say 110 pounds. After the stock comes from the chip bin, it is cooked a certain number of hours. You have a certain course and you follow that procedure. In this case, in this mill, they cook it for around six hours, and after your stock is cooked it is blown out,

of the digester under pressure into your diffuser tank, and while you blow the stock out of the digester into the diffuser tank, there is a supply of black liquor that we want to recover. There are certain chemicals in the black liquor that we want to recover. So after we have the stock in the diffuser tank, we let the black liquor drain down, and we let that flow to our black liquor tank. We use that liquor to make up new liquor for the next cooking. After as much liquor as possible is drained down, we then force it down with water pressure. We take that down and it all goes into our makeup liquor. After that we turn on our diffuser valves, which are these Sandberg diffuser valves. The purpose of these valves is to empty your diffuser tank. That is done automatically and that fall goes down to your stock chest.

\*      \*      \*      \*      \*      \*      \*

Q. Where does the stock go from the digester?—A. After your stock is cooked in your digester, it is blown into your diffuser, by pressure.

\*      \*      \*      \*      \*      \*      \*

Q. What is the source of that pressure?—A. That source can be either steam or it can be generated by coal or oil.

\*      \*      \*      \*      \*      \*      \*

Q. Is the diffuser tank connected with the digester?—A. Yes, sir.

Q. In what way?—A. You must have the one with the other. The whole system is operated under pressure. You are blowing the stock under pressure from the digester and it goes into the diffuser.

Q. Can the digester be operated without the diffuser?—A. Not very well.

Q. What do you mean by that?—A. You have to have a means to get the stock out of the digester and the only way I know of is to use the diffuser.

\*      \*      \*      \*      \*      \*      \*

Q. Just what does this valve do; that is, this Sandberg diffuser valve.

Judge KEEFE. That is the importation?

Mr. SCHWARTZ. Yes, sir.

A. That valve, the only thing it is for is to empty the diffuser.

By Mr. SCHWARTZ.

Q. How does it do that?—A. It does it automatically. In this case here, we have a one-half horsepower motor, electric motor, connected with a worm gear reducer and the operator on the cooking floor opens a lever, and that raises your connection or your valve in the bottom of your diffuser and at the same time it engages your motor and the water rotates out and brings your stock down.

Q. I show you another blueprint and ask you what that is?—A. This drawing shows the Sandberg valve and a small cut with the diffuser and the valve in conjunction with it.

\*      \*      \*      \*      \*      \*      \*

Q. I notice that in this case four electric motors came in in the same importation with the valves. Do you know what the purpose of those motors was?

\*      \*      \*      \*      \*      \*      \*

A. In this case, motors are frequently connected to the valves.

\*      \*      \*      \*      \*      \*      \*

Q. Does this valve have any moving parts?—A. Yes.

Q. Will you please state which parts are in motion when the valve is in operation?—A. When your valve is in operation, the conical head moves and the water rotates around it.

Judge KEEFE. In other words, the mechanism is operated by water that pushes the material and brings it down to the bottom?

The WITNESS. That's right.

By Mr. Schwartz.

Q. Can you operate a diffuser tank, such as you have been talking about and such as you described and is shown on Illustrative Exhibits A and B without the Sandberg diffuser valve?—A. Yes.

Q. Would the construction have to be changed?—A. You have to rebuild the whole tank. In the old system, they used to unravel it.

Q. Without rebuilding the whole tank, can you operate it without the Sandberg diffuser valve?—A. No. The basis of the whole tank is where the valve fits.

Judge Keefe. In other words, the machine, the Sandberg machine, accomplishes by power what used to be accomplished by hand; is that right?

The Witness. That's right.

By Mr. Schwartz.

Q. Just state what this valve does; just what does it do.—A. This valve, the whole thing is: after you blow your stock from the digester into the diffuser you have to take the stock out of the diffuser, and that is done by the valve. It is done automatically. It is all one enclosed system.

Upon this record we find the following facts:

1. That the merchandise at bar invoiced as a "Sandberg diffuser valve" is part of a complete pulp-making system.

2. That said valve expedites and regulates the flow of water from a so-called diffuser tank which is also an integral part of said pulp-making system.

3. That said diffuser tank cannot operate without said valve.

4. That said valve is connected with a lever and an electric motor, both of which are essential and integral parts of said pulp-making system.

5. That said diffuser tank cannot operate without the so-called Sandberg diffuser valve unless the said tank was completely reconstructed.

These facts clearly distinguish the instant case from *Gallagher & Ascher, Inc.* v. *United States*, C. D. 178, 2 Cust. Ct. 468, in which precisely similar merchandise was involved. In that case we said:

In our opinion neither the diffuser tank nor the regulating valve may be considered a machine within the meaning of said paragraph 372. *Simon, Buhler & Baumann, Inc.* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537; *United States* v. *Klingerit, Inc.*, 17 C. C. P. A. 472, T. D. 43931; *United States* v. *Race* Co., 22 C. C. P. A. 327, T. D. 47362.

It may well be that the diffuser tank of which the imported valve is a part is in turn an integral and essential part of a larger mechanism used in the manufacture of paper pulp without which said larger mechanism could not perform the function for which it was designed, and that the whole apparatus is a machine within the meaning of said paragraph 372, but the evidence fails to establish that fact. *United States* v. *Willoughby Camera Stores*, 21 C. C. P. A. 322, T. D. 46851.

Following the cited case the claim of the plaintiff that said valves are in themselves machines within the meaning of said paragraph 372 must be and hereby is overruled.

On the other hand, the facts herein clearly distinguish the instant case from that of *Gallagher & Ascher, Inc.* v. *United States, supra.* Here, according to the uncontradicted testimony, the diffuser tank, of which the imported valve is a part, is an indispensable, integral, and essential part of a larger mechanism used in the manufacture of paper pulp, without which said larger mechanism could not perform the function for which it is designed. Therefore, we hold that the whole apparatus is a machine within the meaning of said paragraph 372. *United States* v. *Willoughby Camera Stores, supra; United States* v. *Sheldon & Co.*, 15 Ct. Cust. Appls. 308, T. D. 42484.

In so holding we are not unmindful of the very recent case of *United States* v. *J. E. Bernard & Co., Inc.*, 28 C. C. P. A. 182, C. A. D. 142, in which the appellate court held that certain sheet filters were not parts of bottling machines. In that case the court said:

From the evidence in the case it is apparent that the filters are devices which possess no mechanically operating features. Liquids are conveyed to and forced through them by an independent mechanism—a pump—which, so far as the record discloses, might readily be used for pumping in other connections. After passing through the filters, the liquids are conveyed by means of tubes to a container-filling device which, so far as the record shows, might be used for the same purpose in an entirely different relationship. * * *

In the instant case it is evident from the record, and particularly from an examination of illustrative exhibits A and B, that the electric motor, the lever, the diffuser tank, and the valve in question are all parts of one apparatus and cannot be otherwise used without dismantling the entire pulp-making machine. In our opinion, this fact clearly distinguishes the instant case from that of *United States* v. *J. E. Bernard & Co., supra.*

Hence, upon the established facts and the law applicable thereto we hold the so-called Sandberg diffuser valves constituting the imported merchandise at bar to be properly dutiable at the rate of 20 per centum ad valorem under the provision for "machines for making paper pulp or paper, not specially provided for, and parts thereof, not specially provided for, wholly or in chief value of metal or porcelain," incorporated in paragraph 372 of the Tariff Act of 1930 by virtue of said trade agreement between the United States and Sweden promulgated in T. D. 47785, 68 Treas. Dec. 19, as alleged by the plaintiff. That claim is therefore sustained; but as to all other merchandise the claims are overruled. Judgment will be rendered accordingly.